the friction due to the pivotal relation of the members as to each other as well as to the wire mesh between them. Thus in its latest device the defendant employs different means, and a distinct mode of operation, producing a similar result, and permitting the frame to be taken apart and put together without the necessity of removing or putting back any screws.

[2] This suit was based upon the earlier device. Inasmuch as some of these were sold after notice, the decree for injunction and accounting was proper. The injunction and accounting, however, must be understood as limited to such of defendant's devices as have the groove in the outer portion of the frame member or some other pivotal connection, and in which either the screws are used as the means for holding the members in clamping position, or in which the screen cloth is held gripped between the ribs.

Decree affirmed.

---

## JOHNSTON v. STEWART.

(Circuit Court of Appeals, Second Circuit. December 12, 1916.)

### No. 100.

PATENTS ⬦328—INFRINGEMENT—BUILDING MATERIAL.

 The Cottom patent, No. 650,824, for a building material consisting of concrete blocks, to be laid in the wall in such manner as to be anchored together by cement bars, construed, and *held* not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Walter D. Johnston against Clarence W. Stewart for infringement of letters patent No. 650,824 for building material, granted June 5, 1900, to J. B. Cottom. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of Learned Hand, District Judge, in the court below:

I think the meaning of this patent is not primarily to make a ventilated wall at all, although the claims do contain that element. A ventilated wall is provided for; that is undoubtedly true, but there is no mention of ventilation until we get to line 101, after the patent itself has been very carefully described in full. Then provision is made for ventilation by a tube which is afterwards to be withdrawn. It seems to me it is quite clear that what the patentee chiefly intended was to get a series of concrete blocks, which he could anchor together by solid concrete bars going from the top to the bottom of the wall. I refer particularly to the passage on the first page, which begins at 86: "When the blocks are thus laid in the construction of a wall, it will be observed that each block does not depend for its security on the mortar or cement as usually applied between the faces of bricks, but, on the contrary, have 'cement bars,' so to speak, which extend through them at two points in the body of each block and which also securely unite the ends of said blocks to form continuous horizontal row of blocks." That last clause probably refers to the dwelling; but it is quite clear, when one looks at the figures, that he had in mind something quite different from what has been called here by one of the witnesses a doughnut or mortise of cement squeezed out by the weight of the blocks, which is all that Stewart uses.

This conclusion is re-enforced by the fact that all of the figures on the first

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

page--that is, Figs. 1, 2, and 3—show the cement bar, but do not show the ventilation. The ventilation is shown only in Figs. 5 and 6, and these are apparently alternative features, as appears in line 101. Coming to the claims, it is quite true that the ventilation is made an element, and so we must accept it; but we have on that account no right to disregard the "cement bars," which the claims also incorporate, and which have been clearly shown in all the drawings. The language of the claim in this respect is as follows: "By means of which a continuous body of cement may be placed to rigidly secure said blocks from top to bottom of a wall."

Furthermore, the description of the process on the second column of page 1 is illustrative. It is quite clear that the semi-liquid cement is to be poured in until it fills the whole column made by the holes in the blocks when superposed on one another. This filling or cement accounts in part for the singular shape of the funnels themselves, each one being double. I think the patentee's theory was that, by securing a break in the line of each block, he could get a stronger bond than if he had a straight cylindrical column going all of the way through. I do not therefore think, taking the patent alone as it stands, we should call Stewart's blocks when laid an infringement, because there was no column of concrete running through, no "continuous body."

If we were so to interpret the claim, I should, moreover, have great doubt of its validity in the face of Smithmeyer. It is true that Smithmeyer did not disclose the bond between brick and brick as part of what he wanted to accomplish, but he did have it in mind, whether he desired it or not, in the language of lines 51 to 54: "The cup-shape depressions forming receptacles for any excess of mortar without infringing upon the ventilating capacity."

Of course Smithmeyer was laying bricks, and bricks are shallow for their length and width. They do not need anything but a surface bond. It was natural that Smithmeyer should not have spoken of that bond as one of the advantages secured by his patent, but he provided for it, nevertheless, and I cannot agree that it was a mere casual or accidental result of his invention. It was an inevitable and necessary result of his invention that there should be an anchor of cement at each orifice, caused by the extrusion of cement. I am justified in making that assertion without any express evidence, because the laying of bricks and the mortar is a commonplace thing in everyone's experience; I think I can take notice of the fact that mortar is a plastic bonding material, and that bricks, when they are laid, are laid with a little pressure or tapping. We know that the brick itself, when laid on the mortar, will squeeze a little of the mortar out. It is a very familiar recollection of every person who has lived where building has been going on to see mortar scraped off the face where solid bricks are laid. Since Smithmeyer's bricks had holes in them, the necessary squeezing and tapping would cause some of this mortar to go into this space B. The patentee was aware of that and provided for it, although he did not suppose it to be of advantage. Mr. Kenyon says that very little will be squeezed through. I cannot say how that would be, and I do not think it is of any consequence. The action is there; the degree of the action depended upon what the consistency of the mortar was, but the action was there. In this connection it must be noted that Smithmeyer does not confine himself to bricks; he speaks of blocks as well, and specifically says that he does not wish to limit himself in any manner as to material used, but may employ any of the well-known materials which may be desired. That was in June, 1883, when working in concrete was well known. Therefore, if it were proper so to interpret claim 1 as to cover Stewart's construction, I should have a very grave doubt as to whether it was valid in the face of Smithmeyer.

I do not think, however, that it is essential that I should make a finding upon that question, in view of the construction I have put upon the claim.

Kenyon & Kenyon, of New York City, for appellant.
A. Parker Smith, of New York City, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

PER CURIAM.   Decree affirmed.